Nathan D. Ellis
Ellis Law, PLLC
2047 North Last Chance Gulch #482
Helena, Montana 59601
(406) 475-5900
nate@ellis.law

Christopher R. Betchie
Hull Swingley & Betchie PC
P.O. Box 534
Helena, Montana 59624
(406) 204-5710
Christopher@hullmtlaw.com

*Attorneys for Plaintiff William Trevor Case*

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MONTANA BUTTE DIVISION

| | |
|---|---|
| WILLIAM TREVOR CASE,<br><br>    Plaintiff,<br><br>vs.<br><br>RICHARD STANLEY PASHA, WILLIAM SATHER, DAVE HEFFERNAN, BLAKE LINSTED, in their individual and official capacities, ANACONDA-DEER LODGE COUNTY<br><br>    Defendants. | Case No.:<br><br><br>COMPLAINT AND DEMAND FOR JURY TRIAL |

COMES NOW Plaintiff, William Trevor Case, ("Trevor"), by and through his

attorneys of record, and alleges and complains as follows:

//

## JURISDICTION AND VENUE

1.  Jurisdiction is founded upon the existence of a federal question.

2.  This is an action to redress the deprivation under color of statute, ordinance, regulation, custom or usage of rights, privileges, and immunities secured to the Plaintiff by the Fourth and Fourteenth Amendments to the Constitution of the United States. 42 U.S.C. § 1983.

3.  This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331, 1343(a)(3)-(4), and supplemental jurisdiction to hear the common law claims under 28 U.S.C § 1367.

4.  Venue is proper in the District of Montana because the acts or omissions that form the basis of Plaintiff's claims occurred in Deer Lodge County, Montana.

## PARTIES

5.  Plaintiff incorporates and re-alleges Paragraphs 1 through 4 as if fully set forth herein.

6.  At all times relevant to this Complaint, Plaintiff Trevor Case was a military veteran who resided at 307 West Commercial Way, Anaconda, Montana.

7.  At all times relevant to this Complaint, Defendant Richard Pasha was a duly sworn and licensed police officer of the Anaconda-Deer Lodge County Department of Law Enforcement acting under color of law and within the scope of his employment. He is sued in his official and individual capacity.

8.  At all times relevant to this Complaint, Defendant William Sather was the Chief of Police for Defendant Anaconda-Deer Lodge County Department of Law Enforcement and a policy maker acting under color of law and within the scope of his employment. He is sued in his official and individual capacity.

9.  At all times relevant to this Complaint, Defendant Dave Heffernan was a duly sworn and licensed police officer of the Anaconda-Deer Lodge County Department of Law Enforcement acting under color of law and within the scope of his employment. He is sued in his official and individual capacity.

10.  At all times relevant to this Complaint, Defendant Blake Linsted was a duly sworn and licensed police officer of the Anaconda-Deer Lodge County Department of Law Enforcement acting under color of law and within the scope of his employment. He is sued in his official and individual capacity.

11. At all times relevant to this Complaint, Defendant Anaconda-Deer Lodge County, ("ADLC"), was responsible for the polices and procedures of the Anaconda-Deer Lodge County Department of Law Enforcement and the police officers it employs.

12.  At all times relevant to this Complaint, Defendants Sather and ADLC approved or ratified the actions of the other defendants thereby making them liable of the acts and/or omissions of their agents, servants and/or employees.

//

COMPLAINT AND DEMAND FOR JURY TRIAL - 3

## FACTUAL ALLEGATIONS

13. Plaintiff incorporates and re-alleges Paragraphs 1-12 as if fully set forth herein.

14. On the evening of September 27, 2021, Trevor was sitting alone in his home after ending an emotional call with his ex-girlfriend, Jennifer Harris.

15. Because Trevor had threatened self-harm and indicated that he had a loaded firearm, Jennifer Harris called Defendant ADLC's Dispatch to report her concerns that Trevor may have hurt himself after he abruptly ended their phone call.

16. At or about 9:06 p.m., on September 27, 2021, Defendant Heffernan was dispatched to Trevor's residence at 307 West Commercial Avenue, in Anaconda, Montana.

17. While en route to Trevor's residence, Defendant Heffernan radioed Defendants Pasha and Linsted to abandon the call they were responding to so that they could aid him with an alleged welfare/wellness check because they had "dealt with this male before."

18. Defendants Pasha and Linsted then raced to Trevor's residence so that they would arrive prior to Defendant Heffernan.

19. Instead of parking in front of Trevor's residence, Defendants Pasha and Linsted parked their patrol vehicles around the corner from Trevor's residence due to Defendant Pasha's irrational and unreasonable fear of an innocent civilian who

was allegedly suffering a mental health crisis and who had not been accused of any wrongdoing.

20.  Defendants Pasha and Linsted then snuck up on the house so that they could surveil the interior of the property through the windows with flashlights.

21.  Defendants Pasha and Linsted had already withdrew their duty pistols from their holsters and were brandishing such weapons when they first approached Trevor's residence during their alleged welfare/wellness check.

22.  Shortly thereafter, Defendant Heffernan arrived and met with Defendants Pasha and Linsted to discuss the situation before resuming their search of Trevor's residence through the windows to ascertain his position in the house.

23.  Jennifer Harris then arrived at Trevor's residence and spoke with Defendants Heffernan, Pasha, and Linsted. Audio of this conversation is not available as Captain Heffernan intentionally turned off his body camera during this conversation.

24.  After nearly six minutes of sneaking around in the darkness of Trevor's property, Defendant Pasha finally decided to knock on the front door.

25.  Trevor did not respond, nor was he seen by Defendants while they were peering through his windows.

26.  Trevor did not have a duty to respond to Defendant Pasha's knock, as admitted by Defendant Pasha under oath in court on February 14, 2022.

27. After receiving no response, Defendant Pasha tries the door handle and finds that it is unlocked, thereby making his first illegal entry into Trevor's residence.

28. Defendants Pasha, Heffernan, and Linsted then resume their illegal search of Trevor's residence through the windows of the residence, while trapsing through the fenced front and back yards of Trevor's property.

29. During this search, one of the three Defendants notices an empty holster on a table or counter in the Kitchen of Trevor's residence providing the spark for Defendant Pasha's suicide by cop fantasy.

30. Defendants Pasha, Linsted, and Heffernan then approach a male individual in the alleyway behind Trevor's residence to attempt to get additional information concerning Trevor's whereabouts.

31. While returning to the front of Trevor's residence, Defendant Pasha begins to first verbalize his prophetic fantasy, as he starts pushing his unfounded speculation that Trevor may be "out walking around with a gun."

32. Defendant Linsted responded to his supervisor's encouragement to join Pasha's fantasy by chiming in that he was "not liking it."

33. After Defendant Linsted took the bait, Defendant Pasha then revealed the full extent of his dark fantasy stating, "I don't know, do you make entry and then all of a sudden he pulls a gun and then you shoot him, if he's actually not dead."

34. Defendant Linsted cautiously replied to Defendant Pasha: "**or you leave him?**"

35. After more than 20 minutes of sneaking around Trevor's residence and fomenting disgusting fantasies of a potential ambush, Defendant Linsted, notably the most junior officer on scene, finally attempts to call Trevor's cell phone.

36. However, before Defendant Linsted is able to attempt his call, Defendant Pasha ordered Defendant Linsted to come look at the next piece of "evidence" in support of Defendant Pasha's suicide by cop fantasy.

37. Defendant Pasha then points out a notebook with a handwritten document that is visible through the window of the residence.

38. None of the Defendants ever read the contents of the handwritten document prior to making their subsequent illegal entry into Trevor's residence.

39. Despite not having read the handwritten document, Defendant Pasha immediately continues to push his suicide by cop fantasy by insinuating that it was a suicide note.

40. Defendants Pasha and Linsted then returned to Defendant Heffernan's vehicle to inform him of their suicide note theory so that they can get approval to carry out their violent raid on Trevor's residence.

41. While walking to Defendant Heffernan's vehicle, Defendant Pasha again verbalizes his disgusting fantasy that "if we go in there we gotta be careful man, just in case he didn't actually shoot himself."

42. At no time during the evening at issue did Defendant Pasha express any concern for the wellbeing of Trevor, the individual Defendant Pasha was allegedly performing a "wellness" check on.

43. After conferring with Defendant Heffernan, Defendant Pasha then admits the existence of his unreasonable apprehension of bodily harm, prior to even entering the residence or ever seeing a weapon, by stating that he is "scared that maybe he [Trevor] didn't actually shoot himself, because he can't and he's tried suicide by cop before, and he like left us all this so we're gonna go in the house and he's gonna fucking pull a gun on us, is what I'm worried about."

44. Defendant Pasha latter admitted under oath that he had never had prior interactions with Trevor, and that his "knowledge" of Trevor's alleged history of attempts to commit suicide by cop were based on nothing more than police department gossip and rumors.

45. Defendant Pasha's relentless insistence that his blood-soaked fantasy would occur eventually convinced Defendant Linsted to grab his and Defendant Pasha's personal assault rifles from their patrol vehicles.

COMPLAINT AND DEMAND FOR JURY TRIAL - 8

46.   Defendants Pasha and Linsted, continuing to demonstrate not only one of their many dangerous training shortcomings, but also their cowardice and immaturity, then acted like children playing soldier and took up "defensive positions" behind the windows and thin sheet metal (as opposed to actual defensive positions behind cover) of Trevor's truck that was parked on the street in front of his residence while they waited for Defendant Sather to arrive.

47.   During their wait, Defendants Pasha and Lindsted, continued to show a complete disregard for the wellbeing of Trevor, as well as the safety of everyone else in the vicinity, by boasting about how firearm safeties are unnecessary as true operators rely on trigger discipline being their safeties.

48.   At no time prior to their illegal entry did any Defendant discuss the possible need for medical attention for the individual they disingenuously claimed they were there to help.

49.   Defendant Heffernan then approaches Defendants Pasha and Linsted to relate that Jennifer Harris had allegedly stated something to the effect that Trevor had previously told her he would shoot it out with law enforcement should they illegally enter his residence.

50.   Defendant Heffernan intentionally turned off his body camera during the alleged conversation with Jennifer Harris, resulting in a destruction of potentially exculpatory evidence.

51.  In response, Defendant Pasha continued to push his fantasy that Trevor was suicidal and seeking to commit suicide by cop.

52.  Defendant Pasha then continues his sickening fantasy, eagerly discussing various scenarios where he gets to gun down Trevor during the alleged welfare/wellness check, which is interrupted by Defendant Heffernan's attempt to calm down a now almost hysteric Defendant Pasha by stating, "we just go in and watch each other's backs."

53.  Again, attempting to deescalate the situation and talk down Defendant Pasha, Defendant Linsted offered that they could utilize the ballistic shield because it "takes the gun out of the fight."

54.  Upon his arrival, Defendant Sather immediately asks if Defendants Pasha, Linsted, or Heffernan had night vision to use in their alleged welfare/wellness check.

55.  The Defendants then discuss everywhere in Trevor's residence they have been able to search, and the locations they have not been able to search from the outside of the residence.

56.  At this point, Defendant Heffernan asks Defendant Sather if he should go back to the station to pick up the ballistic shield, which Defendant Sather approved.

57.  While Defendant Heffernan is retrieving the ballistic shield, Defendant Pasha again pushes his suicide by cop fantasy, to which Defendant Sather firmly replied, "I don't think he's going to shoot us."

58.  Defendants Sather, Pasha, and Linsted then discuss Trevor's prior mental health issues and interactions with law enforcement. Notably, Defendant Pasha testified under oath in court on February 14, 2022, that he had never had a prior interaction with Trevor, and he had, as such, only heard and spread rumors concerning Trevor.

59.  During the rehashing of old department rumors, Defendants Sather, Pasha, and Linsted grossly mischaracterize the facts of Trevor's previous interactions with Defendant ADLC's Department of Law Enforcement, as evidenced by the written reports previously filed by Defendants Heffernan and Linsted at the time of the incidents.

60. During this discussion, Defendant Linsted admits his prejudice against veterans, such as Trevor, in implying that Trevor may be dangerous entirely due to his status as a military veteran having allegedly served in the Airborne. The remaining Defendants at the scene did not voice disapproval with such a discriminatory statement.

61.  Defendant Pasha then continues to ramble on about his fantasy ambush, ending with his concern "that he's gonna make us come into his house and he's gonna want to shoot it out, and so I want to be prepared."

62. However, Trevor did not make Defendants enter his residence and had previously begged Ms. Harris not to involve the police during their phone conversation.

63. Defendant Sather again attempts to calm down Defendant Pasha by stating that "he ain't got the guts."

64. Defendant Sather's attempts to calm down Defendant Pasha fall on death ears, as Defendant Pasha then displays his bloodthirst in lamenting his missing a prior hostile encounter stating "this is three standoffs in two days. Last night, today during the day, which I feel like shit about, because I fell asleep and didn't have my phone on the charger so my phone was dead." After this statement, Defendant Pasha can be heard swearing to himself and taking several deep breaths.

65. Prior to illegally raiding Trevor's residence, Defendant Pasha states that he is going to make a tactical entry and "pie the front room off the living room" during the alleged welfare/wellness check.

66. By the time Defendants had made their second entry, they had been on scene for nearly 40 minutes, evidencing a complete lack of any exigent/emergency circumstances.

67. Shortly before their illegal entry, Defendant Pasha states that there are only two options, either Trevor is dead, or they are going to get in a shootout with him.

68.  Defendant Pasha never states any concern for the welfare of Trevor prior to shooting him in his own residence.

69.  Defendants had no reason to believe, nor any evidence, that anyone other Trevor was occupying his residence at the time.

70.  As Defendant Pasha illegally enters Trevor's residence for the second time, he shouted his demands: "Trevor, it's the Police Department. We want to check your welfare, **come out with your hand up**" while sweeping the room with his personal assault rifle.

71. Immediately upon illegally entering the residence, Defendant Heffernan set down the ballistic shield that they had delayed the "welfare check" in order to retrieve from the police station, again evidencing the lack of exigent and/or an emergency situation.

72. After tactically clearing the first floor as part of the alleged welfare/wellness check, Defendants Sather and Heffernan decided to proceed downstairs to search the basement, while Defendants Pasha and Linsted decided to proceed upstairs to search the bedrooms.

73.  Trevor had no duty to respond to Defendants.

74.  Trevor had not been accused on any wrongdoing and wanted to be left alone in his residence.

75.  Trevor had been sitting upstairs in a bedroom closet hoping that Defendants would stop their illegal behavior as he did not want to engage with law enforcement that evening, as Defendants had been escalating their violent behavior towards him each prior interaction.

76.  Seeing that Defendants were not going to respect his basic constitutional rights, nor leave his residence without illegally searching every nook and cranny, he decided to belatedly comply with Defendants unlawful orders and exited the closet, which was partially covered with a fabric curtain.

77.  Unfortunately for Trevor, Defendant Pasha had just entered the room Trevor was in when he began to exit the closet by pulling open the curtain with his left hand.

78.  When Defendant Pasha saw a motion out of the corner of his eye, he rapidly swung his personal assault rifle toward Trevor, immediately firing as soon as his sights were on Trevor.

79.  Although Trevor had a pistol with him in the closet, this pistol was not visible at the time he was shot by Defendant Pasha, as documented by Defendant Pasha's immediate statements and body camera footage.

80.  Trevor was shot in his left arm and the lower abdomen.

81.  After wrongfully shooting Trevor, Defendant Pasha immediately expresses guilt for his abhorrent actions, exclaiming "oh shit!"

82.  No weapon or outline of a weapon is visible until after Trevor was shot in his own home while complying with Defendants' unlawful orders.

83.  At no time did Trevor point his pistol at any of the Defendants.

84.  At no time did Trevor swing his pistol towards any of the Defendants.

85.  As he was falling to the ground, Trevor's right hand appeared for the first time hanging down by his waist with a pistol, which he dropped into a nearby clothes basket.

86.  After calling for emergency medical services, Defendant Pasha is asked where he shot Trevor, to which he replied "I, I came in and he jerked that curtain open, and I shot him right here. I shot him."

87.  Defendant Pasha then orders a motionless Trevor, who is on the floor bleeding from a gut shot, to "put your hands behind your back buddy," again displaying a total lack of care for the wellbeing of Trevor who had just been shot during a "wellness check" for complying with orders.

88.  After being shot by Defendant Pasha, Defendant Linsted asked Trevor several times if he had a gun on him, as none of the officers present had seen Trevor's firearm prior to Trevor being shot.

89.  Shortly thereafter, Defendant Heffernan is the first to notice Trevor's pistol that had been lying in the clothes basket besides him.

90.  Defendant Heffernan then asks the other Defendants who's pistol it was.

91.  Defendant Pasha then admits on camera that he never saw a pistol prior to shooting Trevor stating, "**I don't know where that came from.**"

92.  However, on February 14, 2002, County Attorney Ben Krakowka knowingly suborned perjury from Defendant Pasha who lied under oath stating that he had seen what he thought was a pistol at the time Trevor exited the closet, in clear contradiction to his own statements and events depicted on his body camera footage.

93.  After Defendant Heffernan informed Defendant Pasha that the pistol was found in the clothes basket that was next to Trevor, Defendant Pasha again admits "**maybe he dropped it, I don't know.**"

94.  Shortly thereafter, Defendant Sather contacts the Division of Criminal Investigation to report the officer involved shooting. During this conversation, Defendant Sather attempted to taint the investigation to protect Defendant Pasha by falsely stating "but he had a loaded gun, swung it out, pointed it a Pasha, and Pasha shot him."

95.Defendant Sather did not witness the shooting of Trevor, and his statements that Trevor had swung a gun and pointed it at Defendant Pasha were contrary to the statements made at the scene as well as the footage of the shooting.

96.  At this point, no officer had verified that Trevor's pistol was chambered with a live round, only that the hammer was cocked.

97.  At this point, Defendant Pasha, the only other witness to Trevor's shooting, had still not stated that he had even seen a weapon, let alone seen one pointed at him.

98.  Defendant Pasha, visibly shaken, then heads outside while recounting the events to Defendant Linsted and Sather stating, "fucking lady just told us, that he was fucking going to shoot it out with us if we went in that house, and he, and I fucking I, I told [Defendant Linsted] there's a door on the right, I said there's a closet at the end of the hallway, there's a door on the left. I said I'm go in and clear the right, so I went right, and I swooped right, and I was coming back left, and that fucking curtain came tearing open and I, **and I let one fly then.**"

99.  At this point, despite recounting this event nearly identically several times after shooting Trevor, Defendant Pasha never once stated that Trevor pointed a pistol or that he even saw a pistol prior to shooting Trevor.

100.    Trevor was subsequently transported by emergency medical services to the local hospital, and later transferred to St. Patrick's hospital in Missoula to receive treatment for his gunshot wounds.

101.    In an effort to cover up its employees' violent assault against Trevor, Defendant ADLC employee, County Attorney Ben Krakowka, suborned Defendant Pasha's perjury in order to bring unfounded criminal charges against Trevor in bad faith.

102.     Due to the unfounded criminal charges, Trevor was suspended from his position of employment as a Fifth-grade teacher without pay.

103.     Defendant ADLC's employee, County Attorney Ben Krakowka, has subsequently continued to act in bad faith through constant harassment, including increasing random alcohol testing without cause, and threating to revoke Trevor's release pending trial for a false report of stalking that was simply an avalanche beacon that had gone off in the reporting party's basement.

104.     Prior to September 27, 2021, Defendant ADLC Department of Law Enforcement had been offered crisis intervention training but declined to train its officers.

## COUNT I
### (Civil Rights Action (42 U.S.C. § 1983) Against Defendants for Illegal Search and Seizure of Plaintiff)

105.     Plaintiff incorporates and re-alleges Paragraphs 1 through 104 as if fully set forth herein.

106.     Trevor had a clearly established right under the Fourth Amendment to the U.S. Constitution to freedom from unreasonable searches and seizures. Specifically, Trevor had a clearly established right to ignore the Defendants' demands to answer his door without being subject to an extrajudicial execution.

107.     Trevor had a clearly established right under Article II, Section 11 of the Montana State Constitution to freedom from unreasonable searched and seizures.

108.     At the time of Defendants' illegal raid, it was clearly established law that a warrant is required in order to search a residence.

109.     At the time of Defendants' illegal raid, it was clearly established law that a warrant is required in order to make an arrest in the home.

110.     At the time of Defendants' illegal raid, it was clearly established in *Caniglia v. Strom*, 141 S.Ct. 1596, that Federal law does not recognize a 4th Amendment exception to the warrant requirement for welfare/wellness/community caretaking checks performed in a personal residence.

111.     At the time of Defendants' illegal raid, it was clearly established law that Montana's exigent circumstances exception to the warrant requirement required both exigent circumstances and probable cause.

112.     At the time of Defendants' illegal raid, it was clearly established law that the exigent circumstances exception to the warrant requirement did not apply to residences.

113.     At the time of Defendants' illegal raid, Defendants lacked a warrant as well as probable cause, as admitted by Defendants Pasha, Sather, Heffernan, and Lindsted under oath on February 14, 2022.

114.     Defendant Pasha admitted under oath on February 14, 2022, that Trevor had no duty to answer the door, and yet, cognizant of Ms. Harris's reports of a threatened shootout, he decided to attempt to provoke a violent confrontation with

an individual who had every right to remain unbothered and unharmed in his own residence by initiating an armed home invasion.

115.    Defendants terminated Trevor's freedom of movement when Defendants illegally raided his home with assault rifles and shot him.

116.    Trevor was the object of the detention.

117.    Trevor did not feel free to leave his residence.

118.    Defendants' search of Trevor and his residence was unreasonable as there was no valid warrant at the time of Defendants' illegal entry to Trevor's residence, and no exception to the warrant requirement existed.

119.    Defendant Pasha admitted under oath on February 14, 2022, that Trevor was not suspected of any wrongdoing on the night at issue, and therefore, there was no probable cause at the time of Defendants' illegal entry into the residence.

120.    Defendants' seizure of Trevor was unreasonable as there was no warrant, or valid exception thereto, to seize Trevor in his own residence at the time of Defendants' illegal raid.

121.    Defendants were not investigating a crime but rather conducting an alleged welfare/wellness check.

122.    Defendant ADLC is liable for the actions taken by their policy maker Defendant Sather.

123.     During the relevant period, Defendants Pasha, Sather, Heffernan, and Linsted were acting under color of law.

124.     Trevor was subjected to extreme violence, severe bodily harm, humiliation, fear, and severe emotional distress due to the illegal acts of Defendants and is entitled to injunctive relief, compensatory damages, attorney fees, and punitive damages.

## COUNT II
**(Civil Rights Action (42 U.S.C. § 1983) Against Defendants for Excessive Force)**

125.     Plaintiff incorporates and re-alleges Paragraphs 1 through 124 as if fully set forth herein.

126.     Trevor had a firmly established right under the Fourth Amendment to the U.S. Constitution to be free from physical abuse, assault, battery, and intentional infliction of emotional distress. Trevor had a firmly established right to be free from excessive force being used against him to effect an arrest, search or seizure; to be free from the imposition of summary punishment without due process of law; and to be free from the imposition of cruel and unusual punishment.

127.     On September 27, 2021, Trevor posed no threat to Defendants when he was shot by Defendant Pasha.

128.    Defendant Pasha used objectively unreasonable and excessive force in this detention and arrest of Trevor when he attempted to kill him with his personal assault rifle for failing to answer the door or comply with his unlawful demands.

129.    The remaining Defendants used objectively unreasonable and excessive force in this detention and arrest of Trevor when they attempted to restrain and arrest the victim of a violent crime, Trevor Case, after being shot by Defendant Pasha.

130.    Defendants Pasha, Sather, Heffernan, and Linsted were at this time performing their duties as employees of Defendant ADLC's Department of Law Enforcement.

131.    Defendant ADLC is liable for the actions taken by their policy maker Defendant Sather, who as a policy maker ordered, authorized, and/or condoned the actions of Defendants Pasha, Heffernan, and Linsted.

132.    During the relevant period, Defendants Pasha, Sather, Heffernan, and Linsted were acting under color of law.

133.    As a result of Defendants' actions, Trevor was subjected to extreme violence, severe bodily harm, humiliation, fear, and severe emotional distress due to the illegal acts of Defendants and is entitled to injunctive relief, compensatory damages, attorney fees, and punitive damages.

//

COMPLAINT AND DEMAND FOR JURY TRIAL - 22

## COUNT III
### (Civil Rights Action (42 U.S.C. § 1983) Against Defendants Sather, Heffernan, and Linsted, in their individual capacity, for Failing to Intervene)

134.     Plaintiff incorporates and re-alleges Paragraphs 1 through 133 as if fully set forth herein.

135.     Defendants Sather, Heffernan, and Linsted had a duty to intervene and stop Defendant Pasha's unconstitutional and illegal conduct.

136.     As alleged in Paragraph 36, Defendant Linsted verbally acknowledged the only legal option available, and yet he and Defendants Sather and Heffernan all failed to intervene in Defendant Pasha's abhorrent conduct.

137.     Defendants Sather, Heffernan, and Linsted observed Defendant Pasha illegally enter and search Trevor's residence without a warrant, probable cause, or even reasonable suspicion, and also observed Defendant Pasha detain and arrest Trevor using objectively unreasonable and excessive force, both in violation of Trevor's right to be free of an unreasonable seizure under the Fourth Amendment.

138.     Defendants Sather, Heffernan, and Linsted failed to intervene and prevent Defendant Pasha from violating Trevor's Fourth Amendment rights to be free of an unreasonable seizure, although such Defendants had a reasonable opportunity to do so.

COMPLAINT AND DEMAND FOR JURY TRIAL - 23

139.    The acts of Defendants Sather, Heffernan, and Linsted violated the Plaintiff's rights under the due process clause of the Fourteenth Amendment, enforceable through 42 U.S.C. § 1983.

140.    Defendant ADLC is liable for the actions taken by their policy maker Defendant Sather, who as a policy maker ordered, authorized, or condoned the actions of Defendants Pasha, Heffernan, and Linsted.

141.    During the relevant period, Defendants Pasha, Sather, Heffernan, and Linsted were acting under color of law.

142.    As a result of Defendants' actions, Trevor was subjected to extreme violence, severe bodily harm, humiliation, fear, and severe emotional distress due to the illegal acts of Defendants and is entitled to injunctive relief, compensatory damages, attorney fees, and punitive damages.

## COUNT IV
### (Civil Rights Action (42 U.S.C. § 1983) against Defendant ADLC for Municipal Liability)

143.    Plaintiff incorporates and re-alleges Paragraphs 1 through 142 as if fully set forth herein.

144.    Defendant ADLC at all relevant times has maintained a policy, custom, or practice that has been the cause, the moving force, behind the violation of citizens' rights. Specifically, this policy, custom, or practice involves:

COMPLAINT AND DEMAND FOR JURY TRIAL - 24

a. The use of objectively unreasonable and excessive force on detainees and arrestees.

b. The use of illegal warrantless searches and seizures of individuals in their homes when alleged to be suffering mental distress.

c. Charging victims of police violence with felony charges in order to cover up the crimes of its officers.

145.    The above-described policy, custom, or practice was the direct, proximate cause of Defendants Pasha, Sather, Heffernan, and Listed violating Trevor's Fourth and Fourteenth Amendment rights, enforceable through 42 U.S.C. § 1983.

## COUNT V
### (Civil Rights Action (42 U.S.C. § 1983) against Defendant ADLC for Deliberate Indifference to Training and Supervision)

146.    Plaintiff incorporates and re-alleges Paragraphs 1 through 145 as if fully set forth herein.

147.    Defendant ADLC's County Attorney, Ben Krakowka, has admitted that warrantless seizures for mental health crises are a regular practice in Deer Lodge County.

148.    As such, it was substantially certain that if Defendant ADLC did not properly train and supervise its law enforcement officers on how to respond to

mental health crises, and on the Constitutional rights of those suffering from mental health crises, widespread violations of rights would ensue.

149.     Despite this, Defendant ADLC maintained a policy or custom of deliberate indifference to the hiring, training, supervision, or discipline of its law enforcement officers, which caused them to violate Trevor's Constitutional rights.

150.     As a result of Defendants' actions, Trevor was subjected to extreme violence, severe bodily harm, humiliation, fear, and severe emotional distress due to the illegal acts of Defendants and is entitled to injunctive relief, compensatory damages, attorney fees, and punitive damages.

## COUNT VI
### (Common Law – Assault and Battery against Defendants Pasha, Sather, Heffernan, and Linsted)

151.     Plaintiff incorporates and re-alleges Paragraphs 1 through 150 as if fully set forth herein.

152.     Defendants Pasha, Sather, Heffernan, and Lindsted, by their acts and words, threatened to do bodily harm to Trevor.

153.     By using excessive and unreasonable force, Defendants Pasha, Sather, Heffernan, and Lindsted caused harmful or offensive bodily contact with Trevor.

154.     The aforesaid acts were unprivileged.

155.     The aforesaid acts of Defendants Pasha, Sather, Heffernan, and Lindsted were taken within the scope of their employment by Defendant ADLC.

156.     The unlawful acts of Defendants Pasha, Sather, Heffernan, and Lindsted were the direct, proximate cause of Trevor's injuries.

157.     As a result of Defendants' actions, Trevor was subjected to extreme violence, severe bodily harm, humiliation, fear, and severe emotional distress due to the illegal acts of Defendants and is entitled to injunctive relief, compensatory damages, attorney fees, and punitive damages.

**COUNT VII**
**(Common Law – Negligent Use of Force and *Respondeat Superior* Liability against all Defendants)**

158.     Plaintiff incorporates and re-alleges Paragraphs 1 through 157 as if fully set forth herein.

159.     Defendants Pasha, Sather, Heffernan, and Lindsted owed a duty of care to Trevor.

160.     Defendants Pasha, Sather, Heffernan, and Lindsted breach their duty of care to Trevor by illegally raiding his home, shooting, and then arresting him.

161.     Defendants Pasha, Sather, Heffernan, and Linsted's breach of their duty of care to Trevor was a direct and proximate cause and a substantial factor in bringing about Trevor's damages as outlined above, and, as a result, defendants are liable to Trevor.

162.     Because the individual defendants were acting as agents, servants, and/or employees of Defendant ADLC, and because the individual Defendants were

acting within the scope and course of their employment, and under the direct control and supervision of Defendant ADLC, Defendant ADLC is liable to Trevor on the basis of *respondeat superior* liability.

## COUNT VIII
### (Common Law – Negligent Hiring, Training, and Supervision)

163.     Plaintiff incorporates and re-alleges Paragraphs 1 through 164 as if fully set forth herein.

164.     Defendant ADLC had a duty to properly hire, train, and supervise its law enforcement officers on how to respond to mental health crises, and on the Constitutional rights of those suffering from mental health crises.

165.      Defendant ADLC breach its duty by failing to properly train and supervise its law enforcement officers.

166.     As a result of Defendant's actions, Trevor was subjected to extreme violence, severe bodily harm, humiliation, fear, and severe emotional distress due to the illegal acts of Defendants and is entitled to injunctive relief, compensatory damages, attorney fees, and punitive damages.

## PRAYER FOR RELIEF

The conduct previously alleged, unless and until enjoined by order of this Court, will cause great and irreparable injury to Plaintiff. Further, a judicial

declaration is necessary and appropriate at this time so that all parties may know their respective rights and act accordingly.

WHEREFORE, Plaintiff requests relief as follows:

1. A declaration that Defendants' policies and practices violate the Fourth and Fourteenth Amendments to the United States Constitution, as well as Article II, Section 11 of the Montana State Constitution.

2. An order enjoining all Defendants and their employees from further violation of Plaintiff's civil rights under the Fourth and Fourteenth Amendments to the United States Constitution, as well as Article II, Section 11 of the Montana State Constitution.

3. An order enjoining all Defendants and their employees from further criminal prosecution of Plaintiff arising from the events of September 27, 2021.

4. Compensatory damages in an amount to be proven at trial.

5. Future and past lost earnings.

6. Punitive damages against the individual defendants for their malicious and flagrant constitutional violations in an amount to be proven at trial.

7. Costs, including reasonable attorney fees.

8. Pre and post judgement interest.

9. Such other relief as the Court deems just and equitable.

//

COMPLAINT AND DEMAND FOR JURY TRIAL - 29

## JURY DEMAND

Plaintiff demands trial by jury on all issues.

Dated this 17th day of June, 2022.


/s/ Nathan D. Ellis

_____

Nathan D. Ellis
*Attorney for Plaintiff*